Duffey, J.,
dissenting. The liability of the hospital here can be predicated on only two theories: (1) That the hospital itself was negligent or (2) under respondeat superior, i. e., that one of its employees was negligent.
The majority opinion recognizes that the evidence is insufficient to support any claim of negligence by the hospital itself. In that respect it agrees with the Court of Appeals. The appellant made no effort to prove such a theory and has never purported to rely upon it. There is no claim or evidence of negligence in the selection of employees, inadequate number of employees, defective equipment, etc. Thus, on this record, the hospital’s liability can only be derivative, based on respondeat superior, for the negligence of its employee.
While elementary, it is also fundamental that under respondeat superior the master responds for the negligence of the servant. If the servant could not be held, then the master cannot be held. On the record here, the ease rests upon the actions of the nurses. Nursing is a recognized profession. Since the negligence aspect is exactly the same as if the employee were the sole defendant, this suit is in that respect a malpractice action against the nurse, although the hospital must pay any liability. Accordingly, the standard of care applicable here is not that applicable to hospitals, but that which applies to a professional nurse.
*509 The trial court in a special instruction charged on the special standand of care applicable to hospitals. This obvious error was induced by the appellee and cannot be relied upon now. However, in the general charge the jury was given the equally erroneous as well as contradictory instruction that negligence in this case meant “want of ordinary care” and the lack of “that care which persons of ordinary prudence are accustomed to exercise under the same or similar circumstances.” This error was not induced by appellee.
The basic issue presented is whether the evidence is sufficient to raise an issue of fact as to malpractice by a nurse.
Appellant was admitted as a patient for the delivery of her first baby. Upon her doctor’s orders she was placed under sedation. She became restless and attempted to get up to go to the bathroom. Because of pressure by the baby on the rectum, most patients in labor feel such an urge. Appellant was sleepy, groggy and very sedated. Only her husband described her as “sort of” delirious. She was observed trying to get out of the bed. The husband told several persons, including one Nurse Boyd, that during appellant’s pregnancy she had been given “pills” for her “nerves” and had become “very sleepy and goofy acting.” He also told the nurses that they “had better watch her or she’ll fall out of the bed,” and asked “if she (one of the nurses) would please watch her closely.”
Appellant was more restless than the ordinary patient in labor. Not infrequently such patients are restless, and this appellant was not more so than other restless patients. The protective bedrails were fully raised — about two feet over the top of the mattress. Straps and other restraint were not allowed on patients in labor. The nurses were checking or attending appellant at frequent intervals and more than the average patient. Just before appellant’s fall, her contractions were occurring about every two minutes, with about a minute and ten seconds between the end of one and the start of the next. One of the nurses would check her at the beginning of almost every contraction, and at least every five minutes. At the time of appellant’s fall, two nurses were engaged in the delivery rooms. A third nurse, acting as head nurse, was engaged in her duties and was at the moment returning from the delivery *510 room on the way to the labor room. The fourth, Nurse Boyd, had been with the appellant.
The medical chart of Nurse Boyd states that at 2:40 p. m. the patient was restless and trying to get up to go to the bathroom. The nurse testified that she observed the appellant during this contraction, and that the appellant then became quiet and asleep. Nurse Boyd then stepped out the door to the nurses’ station some three or four feet from appellant’s bed. At the desk she started to chart her report on appellant. Before she could write anything a Dr. Helman came in. He “asked” or “requested” her to accompany him to examine another patient in labor in a different room. Hospital rules prohibit a doctor from examining a patient in labor without a nurse in attendance. As to the effect of such a “request,” the only testimony on this point clearly shows that if not an order it was certainly more than a mere suggestion — “we have to go with the doctor.” Before Nurse Boyd and Dr. Helman could start examining the other patient, they heard appellant fall. Nurse Boyd testified to a time lapse of about two minutes. The maximum time under the evidence would be at most five minutes from the time she stepped out until appellant’s fall, i. e., 2:45 p. m. There is no evidence that any patient in labor in a bed with raised rails had ever previously climbed out, with or without falling.
There is no basis to challenge the conduct of three of the four nurses. Appellant’s attorney has made no such claim. It is only the conduct of Nurse Boyd that is relied upon.
It is clear that at all times Nurse Boyd was engaged in her duties as a staff nurse in this department. She was not taking a “coffee break,” nor did she leave her duties for her personal benefit. Her act in leaving the labor room was to perform a regular nursing function. If it is significant, it is also clear, that, contrary to the statement in the second paragraph of the syllabus, her purpose in leaving the room was related to this patient, i. e., to chart her report.
Of the time Nurse Boyd was outside appellant’s room, the initial act was stepping out to the nurses’ station, within hearing distance, to prepare a report on this patient. There is no evidence as to where patients’ charts in obstetrical wards *511 usually are or should be kept. The fact that labor rooms are for labor and have a continuous turnover certainly suggests why charting would be done at the nurses’ station. Charting is an essential and important duty of a nurse. There is evidence that nurses are trained to perform that duty as soon as possible after attending a patient or administering any medication. Nurse Boyd testified that, at the moment she stepped out to chart, the contraction was over and appellant was quiet and asleep. There is, of course, no evidence to controvert this.
It is well at this point to emphasize certain other evidence. Nurse Boyd was not a private or special nurse, and she was not assigned to this patient. She was a staff nurse — one of four on duty. Her responsibilities were to the department in general, and therefore included other patients, the nursing station and routine administration. No student nurses were on duty or available. Nurses’ aides or “practical nurses” were not permitted to watch or attend patients in labor.
I cannot say that it is unreasonable for a staff nurse, who has just checked a patient in labor during a contraction and observed her become quiet and asleep, to then turn and step to a desk within hearing distance to perform the duty of charting a report on this patient, which duty requires only a few moments. To find an issue of fact at this point is to determine that appellant’s condition was so critical and extreme that a reasonable staff nurse could only devote her full time in continuous attendance on this one patient.
That leaves Nurse Boyd’s act of responding to Dr. Helman’s request. On the evidence, this absorbed the greatest bulk of the time in question. In my opinion, if appellant wished to rely on that conduct, it was necessary to produce some evidence on the duties and discretion of a staff nurse in responding to such a request.
I fail to see how the majority opinion is strengthened by the fact that some jurors are women (apparently as opposed to men), some of whom the majority assumes to be mothers and whom the majority further assumes to know more about childbirth than “many experts.” This case involves the conduct of a nurse and not childbirth.
It is true that the appellant here (as any plaintiff in a mal *512 practice action) had difficulty producing evidence, both because of the lack of witnesses at the crucial point in this case as well as the professional aspects of the action. However, the difficulty of obtaining evidence is not a substitute for a lack of evidence.
The type of case has, and should have, bearing on how strictly the evidence is viewed. Malpractice has been traditionally distinct from other negligence actions. The distinction lies not just in analytical differences but in recognizing the human factor that patients and jurors tend to expect too much. We tend to fail to distinguish a professional’s mistake in judgment from unreasonable judgment. Anticipating excellence, we condemn in hindsight anything short of perfection. Failure becomes proof of incompetence. The law of malpractice has partially controlled this by a stricter application of the rules of evidence and by emphasis in instructions. There are many who believe that these controls have been eroded in recent years— that with the advance in medicine the judiciary too is now demanding perfection.
I express no opinion on paragraph three of the syllabus. No argument was presented on the point stated there. The majority cites Klema, Admx., v. St. Elisabeth’s Hospital of Youngstown (1960), 170 Ohio St., 519. The employee involved was an unlicensed doctor illegally practicing medicine and illegally employed by the hospital. Having clearly shown that he was not entitled to professional status, the opinion in Klema proceeded to discuss the applicability of the malpractice statute of limitations. It then proceeded to go on and discuss the even more dubiously relevant question of a distinction between “medical” and “administrative” acts. Whatever the demerits of that distinction, it hardly exhausts the possible questions concerning the employment of professional persons. I do not consider obvious dictum on a limited point as authority establishing the law on all aspects of a problem.